UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO.

DELENA BROWN

      Plaintiff,

vs.

CARNIVAL CORPORATION,
WINDFEATHER CHARTERS NV,
RUMBARUBA TOURS NV,
MI DUSHI SAILING AND SNORKELING
TOURS DUTCH CARIBBEAN, and
XYZ CORP.
      Defendants.
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff sues Defendants and alleges:

## SUBJECT MATTER JURISDICTION ALLEGATIONS

### A.  Diversity of Citizenship Allegations

1. This matter is being brought pursuant to the diversity of jurisdiction of this court, under to 28 U.S.C. § 1332.

2. The Plaintiff is a citizen of Georgia.

3. Defendant CARNIVAL CORPORATION (hereinafter "Carnival") is a Florida business entity, with a principal place of business in Miami, Florida.

4. Defendants Windfeather Charters NV, Rumbaruba Tours NV, and Mi Dushi Sail & Snorkeling Tours Dutch Caribbean are believed to be foreign corporations based in Aruba.

5. Defendant XYZ Corp. is a fictitious entity used for purposes of preserving the Plaintiff's right to sue against any unknown tortfeasor entities within the time prescribed

1

by the applicable statute of limitations. Once the identity of the Defendant is known, Plaintiff will substitute the fictitious name.

6.      The matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. §1332.

### B.      Admiralty Jurisdiction Allegations.

7.      ***In the alternative***, in the event that diversity of citizenship does not apply, this matter is being brought under the maritime and admiralty jurisdiction of the Court. In particular, Plaintiff brings this action pursuant to Article III, §2 of the United States Constitution, delegating jurisdiction over admiralty cases to the federal courts. In particular, Plaintiff brings this action pursuant to 28 U.S.C. §1333 which gives Article III courts "original jurisdiction … of … [a]ny civil case of admiralty or maritime jurisdiction." *Aqua Log, Inc. v. Lost and Abandoned Pre-Cut Logs and Rafts of Logs,* 709 F. 3d 1055, 1058 (11th Cir. 2013).

### PERSONAL JURISDICTION ALLEGATIONS

6.      Defendants are subject to the jurisdiction of the Courts of this state.

7.      Defendants, at all times material hereto, personally or through an agent;

  a.      Operated, conducted, engaged in or carried on a business venture in this state and/or country or had an office or agency in this state and/or county;

  b.      Were engaged in substantial activity within this state;

  c.      Operated vessels in the waters of this state;

  d.      Purposefully availed themselves of the benefits of conducting activities in Florida by purposefully directing its activities toward the state, thereby obtaining the benefits and protections of the state's laws;

2

e.      The acts of Defendants set out in this Complaint occurred in whole or in
part in this state.

**A.      The Tour Operator's overwhelming continuous and systematic general
business contacts with Florida satisfy the requirements of the 'general
jurisdiction' section of the Florida long-arm statute, §48.193(2).**

8.      The Plaintiff began and ended her cruise in Florida. Aruba was a scheduled port-
of-call, and was an integral part of the ongoing cruise or maritime activity in this case.
The particular incident in this matter effectively began and ended aboard the cruise ship.

9.      Windfeather Charters NV, Rumbaruba Tours NV, and Mi Dushi Sail &
Snorkeling Tours Dutch Caribbean, and XYZ Corp. (hereinafter collectively "Tour
Operator"), are the tour operators of "Mi Dushi Sail & Snorkel with lunch" excursion, in
Catalina Bay, Aruba.

10.     Since its inception, Tour Operator has engaged in substantial and not isolated
activity within this state under the general jurisdiction section of Florida's long-arm
statute. Fla. Stat. §48.193(2). Tour Operator's continuous and systematic activities with
Florida include: 1) reaching out to cruise lines in Florida and establishing long term
business partnerships with them; 2) deriving the vast majority of its revenues from
business with Florida-based cruise lines; 3) periodically travelling to Florida to meet with
cruise line executives to maintain (and obtain new) business; 4) participating in
SEATRADE, a cruise industry trade show in Florida, and maintaining active membership
in the Florida-based Florida Caribbean Cruise Association; 5)  procuring insurance
through Florida companies and maintaining Florida entities as agents of record for its
insurance purposes; 6) agreeing to insure and indemnify entities in Florida; 7) signing
premium financing agreements with a Florida entity, with the intent to obtain a loan to be

able to pay for liability insurance premiums; 8) signing powers of attorney and appointing attorneys-in-fact in Florida to carry out its Florida operations. In the aggregate, therefore, Tour Operator's business activities in the state of Florida establish general jurisdiction. While any these activities alone may not be deemed sufficient, considered collectively, they establish personal jurisdiction.

11.     Upon information and belief, Cynthia Lee Cynowa and Marc Alan Wiggins, managing directors of Tour Operator, are American citizens.

12.     Since its inception, Tour Operator has been in the business of providing excursions to Florida cruise line passengers in Aruba. The majority of Tour Operator's business comes from Florida-based cruise lines, including Royal Caribbean, Celebrity, Norwegian Cruise Lines, and Carnival. All of these cruise lines are headquartered in Miami, Florida. Tour Operator marketed and sold its excursions in Florida to passengers of these Florida-based cruise lines.

13.     Every year, hundreds of thousands of passengers are brought to Aruba on cruise ships owned by Florida-based cruise lines. Tour Operator attracts these customers to its shore excursions by reaching out to Florida-based cruise lines and establishing business partnerships with them. Upon information and belief, the majority of participants in Tour Operator's excursions have come from Florida cruise lines.

14.     The following cruise lines call on Aruba: Carnival (based in Miami), Celebrity (based in Miami), Cunard (a wholly owned subsidiary of Carnival with shore excursion operations offices in Miami), Norwegian Cruise Line (based in Miami), Oceania Cruises (based in Miami), Princess Cruises (port operations office in Ft. Lauderdale and headquarters in California), Regent Seven Seas Cruises (based in Ft. Lauderdale), and

Silversea Cruises (based in Ft. Lauderdale). Upon information and belief, Defendant Tour Operator has long term business partnerships with all of these cruise lines.

15.   Tour Operator sells excursions to cruise passengers originating in Florida. With regards to Carnival, Tour Operator has sold thousands of excursions to Carnival passengers. During the course of Tour Operator's business partnership with Carnival, these thousands of passengers were brought to Aruba from cruises home ported and originating in Florida. The thousands of passengers that bought Tour Operator's shore excursions boarded the cruise ship in Florida. In other words, these thousands of passengers began and ended their cruise in Florida.

16.    Tour Operator receives the benefits of the advertising efforts of Florida-based cruise lines. When passengers boarded the vessel, Carnival offered, arranged for, recommended, and marketed Tour Operator's excursion in Aruba in various places around its ships. For instance, Carnival allowed passengers to book and pay for Tour Operator's excursion in their stateroom, through an interactive menu in the stateroom's television. There, Carnival passengers could review the menu of Tour Operator's tours, purchase the tour, read about the tour, see pictures, see a video, and all of the items that Tour Operator would offer them upon their arrival to Aruba. Alternatively, Carnival allowed passengers to book and pay for Tour Operator's excursion at the ships' excursion desk and exploration desk. There, passengers could talk to a Carnival crewmember, trained by Carnival, to answer questions and provide information about Tour Operator's excursion and to help the guest book and buy it.

17.   Carnival also advertises and promotes Tour Operator's shore excursions on its websites. These websites, hosted in Florida, specifically target millions of North

5

American cruise passengers. Other Florida-based cruise lines, such as Royal Caribbean and Norwegian Cruise Line also advertise and promote Tour Operator's shore excursions on board their ships, as well as via their websites hosted in Florida, and also targeting millions of North American cruise passengers.

18.     Therefore, one of the clear benefits of an excursion operator like Defendant Tour Operator is that when it enters into agreements with Florida-based cruise lines, it receives the benefits of the cruise line's advertising efforts in Florida directed toward their actual and potential customers in Florida.

19.     Once a passenger books a Tour Operator excursion on a Carnival ship, pays for the excursion in full, and participates in the excursion; Tour Operator sends an invoice to Carnival's accounts payable department, in Miami, Florida. These invoices are then processed and approved by the accounts payable department in Miami, Florida. Once processed and approved, the funds are wire transferred to Tour Operator based on banking details provided to the cruise line. This process is repeated after every shore excursion is completed (on each given cruise). Each month, Tour Operator sends invoices and receives wire transfers processed by Carnival in Florida. Payments to Tour Operator by other Florida- based cruise lines (i.e. Royal Caribbean, Norwegian Cruise line), are also processed by these cruise line's accounts payable departments in Miami, Florida and wire transferred to Tour Operator.

20.     Upon information and belief, Tour Operator's owners and/or representatives periodically travel to Florida in order to maintain existing (and obtain new) cruise business. During these visits Tour Operator's representatives participate in SEATRADE (a cruise line industry convention in Miami), and meet with Florida cruise line executives

at their Florida headquarters. At these meetings, Tour Operator's representatives and Florida cruise line officials discuss existing tours, potential new tours, and operational issues and problems arising from the excursion.

21.     Tour Operator has also been able to maintain its business relationships with Florida-based cruise lines, through its active membership in the Florida Caribbean Cruise Association (FCCA). Based in Pembroke Pines, Florida, the FCCA is a non-profit trade organization composed of fourteen member lines operating more than 100 vessels in Florida. The FCC also offers membership to non-cruise line members, such as Tour Operator. Associate members such as Tour Operator receive valuable mediums in which to network with cruise line executives at FCCA functions. Tour Operator has also been listed in the FCCA's Membership Directory, which is circulated to cruise line executives, and Tour Operator has had access to the FCCA's advertising program (allowing it to place ads at discounted rates in FCCA's Cruising Magazine) and FCCA's insurance program.

22.     After completing the various meetings with Florida cruise line executives, in order to maintain existing (and obtain new) business, Tour Operator submits annual bids for contracts to every Florida cruise line it wants to continue doing business with. The bids are submitted to cruise line executives in Florida. The bids are sent via e-mail to Florida, at cruise line shore excursion departments. Through these bids, Tour Operator offers to Florida cruise lines different excursions it operates in Aruba. The bids include forms (created by Florida cruise lines). In the forms, Tour Operator gives the Florida cruise line information regarding each excursion including:  tour operator information,

tour pricing, timing, accessibility, safety policies, licenses, permits and prior accidents and injuries that have occurred on its tours.

23.    Tour Operator must submit these bids and the attached tour forms every year to cruise line offices in Florida, in order to renew existing agreements and/or obtain new business from the cruise line. Once Tour Operator submits these bids, the Florida cruise lines processes the forms and determines (at their offices in Florida), whether or not to renew and/or expand its existing contract with Tour Operator. By submitting bids and tour proposal templates to Florida-based cruise lines every year, Tour Operator purposefully reached out to cruise lines in Florida to maintain (and increase) the vast majority of its revenues.

24.    Tour Operator agreed to the personal jurisdiction of Florida in contracts with Florida-based cruise lines. After submitting its bids and tour proposal agreements, Tour Operator has entered into contracts to provide shore excursions to passengers of Florida-based cruise lines. These contracts governed all of Tour Operator's shore excursions for Florida cruise line passengers. These contracts were drafted by cruise line legal departments in Florida. Further, upon information and belief, these contracts were executed in Florida.

25.     The contracts include a 'governing law and consent to jurisdiction' section under which Tour Operator has contractually agreed to the exclusive jurisdiction of courts in Florida. Through these contracts, Tour Operator unequivocally stipulated and agreed to the exclusive jurisdiction of courts in Florida for all disputes and matters whatsoever incident to the cruise ticket agreement between the guest (in this case the Plaintiff) and the cruise line. And by agreeing to the jurisdiction of courts in Florida, Tour Operator

purposefully availed itself in advance, and intended to submit itself to the jurisdiction of this Court. *Insurance Corp. of Ireland v. Compagnie des Bauxites De Guinee,* 456 U.S. 694, 704 (1982) ("**[P]arties to a contract may agree in advance to submit to the jurisdiction of a given court.**").

26.     The conferral of jurisdiction clauses contained in these standard excursion contracts undeniably satisfies the constitutional due process requirements because it demonstrates that Tour Operator intended to submit to the jurisdiction of this court.

27.     As part of its contractual obligations with Florida-based cruise lines, Tour Operator procures insurance coverage. The geographical coverage of these insurance policies includes Florida. Tour Operator procures (and pays for insurance premiums) in order to maintain its business relationships with Florida-based cruise lines.

28.     Tour Operator procures insurance from Florida based entities that specifically provide liability coverage to its Florida cruise line business partners, in the event that a Tour Operator passenger is injured on an excursion and brings a claim against the cruise line.

29.     United States citizens who embark on cruises in Florida and buy cruises from Florida-based cruise lines, including the Plaintiff in this matter, are intended third party beneficiaries under the aforementioned insurance policies.

30.     Tour Operator procured insurance through Florida companies and maintained Florida entities as agents of record in Florida for its insurance purposes. During the relevant period, Tour Operator procured insurance through Florida-based insurance brokers. During this time, these Florida-based insurance brokers functioned as Tour Operator's agent.

31.     Tour Operator appointed agents in Florida in order to procure insurance on Tour Operator's behalf.

32.     Upon information and belief, Tour Operator gave powers of attorney to Florida agents, to act on its behalf as attorneys-in-fact.

33.     Upon information and belief, Tour Operator entered into premium financing agreements with Florida entities, in order to pay for insurance policy premiums procured for the benefit of Florida-based cruise lines and passengers, such as the Plaintiff.

34.     In order to defend from the claims in this matter, Tour Operator will hire and retain Florida-based lawyers to represent it in Florida courts.

35.     All in all, Tour Operator's activities "show a general course of business activity in the State [of Florida] for pecuniary benefit." *Stubbs v. Wyndham Nassau Resort and Crystal Palace Casino*, 447 F. 3d 1357, 1361 (11th Cir. 2006) (quotations omitted). This is the type of continuous and systematic general business contact with Florida that satisfies the requirements of the "general jurisdiction" section of the Florida long-arm statute, §48.193(2).

36.     The Tour Operator's overwhelming contacts with Florida subject it to the personal jurisdiction of this state. The facts here, are entirely distinguishable from those at issue in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014). The *Daimler* case was initiated in California by *Argentinian* residents who sued a *German* entity (Daimler) for war crimes committed *in Argentina* by an *Argentinian* subsidiary of Daimler (Mercedes–Benz USA, LLC (MBUSA)). *See Daimler*, 134 S. Ct. at 751. Notably, the only named defendant in the case was the German entity, Daimler. *Id.* at 752. The plaintiffs did not name a single California entity as a defendant in the case that was, again, pending in

California.  Rather, "[j]urisdiction over the lawsuit was predicated on the California contacts of [MBUSA], a subsidiary of Daimler (incorporated in Delaware with its principal place of business in New Jersey." *Id.*  That subsidiary "distribute[d] Daimler-manufactured vehicles to independent dealerships throughout the United States, including California." *Id.*  The Supreme Court attribute MBUSA's contacts to the foreign defendant (Daimler).  Those contacts, however, were insufficient because MBUSA (and therefore Daimler) was not deemed "at home" in the jurisdiction. MBUSA was not "at home" in California because: (1) it was not incorporated in California; (2) it did not have its principal place of business in California; and, (3) its activities (i.e., distribution of vehicles) were directed throughout the entire United States, which prevented the Court from being able to consider the entity at home in every state.

37.   **The circumstances of this case are markedly different.** Unlike *Daimler*, the Plaintiff here (a U.S. citizen) is suing a Florida-based cruise line (Carnival) for injuries sustained while participating in an excursion operated by an agent of the cruise line (Tour Operator) -- an agent that is set up almost exclusively to do business with Florida cruise lines (most of which are based in Florida). Additionally, Because Aruba was a scheduled port-of-call and an integral part of the ongoing cruise; the particular incident in this matter began and ended in Florida. Unlike *Daimler*, Carnival is "at home" in this jurisdiction because Carnival maintains its principal place of business in Florida. Furthermore, under *Daimler*, Tour Operator's overwhelming business operations in Florida deem it to also be "at home" in this jurisdiction. Tour operator is also "at home" in Florida, because the vast majority of its business partnerships and activities in the United States are in Florida.

38.     As noted in *Waite v. AII Acquisition Corp.*, No. 15-CV-62359, 2015 WL 9595222 (S.D. Fla. Dec. 29, 2015), this court explicitly stated that "***Daimler* does not overturn longstanding Supreme Court precedent as it pertains to a general jurisdiction analysis**, nor does it hold that in order for a corporation to be subject to the jurisdiction of a court it must be incorporated or maintain its principal place of business in the forum state."

39.     Under binding Eleventh Circuit precedent the "minimum contacts" prong of the personal jurisdiction inquiry is necessarily case and fact specific. *Guevara v. Republic of Peru*, 468 F.3d 1289, 1306 (11th Cir. 2006)

**B.     Tour Operator's activities in Florida also satisfy sub-section (a) of the Specific Jurisdiction Section of Florida's long-arm statute.**

40.     Tour Operator's activities in Florida also satisfy sub-section (a) of the "Specific Jurisdiction" Section of Florida's long-arm statute. At all times material, Tour Operator reached out to Florida-based cruise lines, insurers, cruise industry associates and premium financing companies solely for the purpose of operating, conducting, engaging in, or carrying on a business or business venture in this state. Fla. Stat. 48.1913(1)(a).

**C.     Tour Operator's activities in Florida also satisfy sub-section (d) of the Florida long-arm statute.**

41.     As part of its contracts with Florida-based cruise lines, Tour Operator contractually agrees to indemnify Florida-based cruise lines (entities mostly located in Miami and Ft. Lauderdale) for any harm resulting to cruise passengers. Accordingly, under 48.193(1)(d), Tour Operator insures persons in Florida. *See Kilma v. Carnival Corporation,* 2008 WL 4559231 (S.D. Fla. 2008) ("If other agreements negotiated in Florida exist between Thriller and other Florida-based cruise lines, if Carnival or other

Florida based cruise lines have agreements to insure and indemnify Thriller for services provided by Thriller to cruise passengers, or there are any other relevant contacts between Thriller and the State of Florida, these activities may be sufficient to establish general jurisdiction under the long arm statute.").

## GENERAL ALLEGATIONS

42.     The causes of action asserted in this Complaint arise under the General Maritime Law of the United States.

43.     At all times material hereto, Defendant Carnival owned, operated, managed, maintained and/or controlled the vessel, *Carnival Conquest.*

44.      At all times material hereto, Defendants Tour Operators owned and/or operated the subject excursion, "Mi Dushi Sail & Snorkel with lunch tour" in Catalina Bay, Aruba which was offered, arranged for, sponsored, recommended, marketed, sold, co-operated and/or managed by Defendant Carnival.

45.     The Tour Operators are believed to have entered into a contract with Carnival for the protection of Carnival's passengers, whereby the Tour Operators agreed to subject themselves to the laws and jurisdiction of the State of Florida, consented to personal jurisdiction over themselves, and consented to the venue of the United States District Court for the Southern District of Florida.  The Tour Operators are believed to have also agreed to indemnify Carnival for the claims made in this Complaint within the meaning of Florida Statute § 48.193(d).   Furthermore, the Tour Operators are subject to the jurisdiction of this Court because they sold the subject excursion ticket through Carnival's website which is administered in Florida.

46.     On or about August 20, 2015, Plaintiff was a paying passenger on the Defendant's vessel, *Carnival Conquest*.

47.      At all times material hereto, excursions from the *Carnival Conquest* were advertised to passengers and the Plaintiff in Carnival's website and Carnival's promotional material, including, but not limited to, brochures which contained Carnival's logo.

48.     At all times material hereto, Carnival offered passengers aboard the *Carnival Conquest* and the Plaintiff the opportunity to go on various shore excursions during the subject cruise, including, but not limited to, Defendant Tour Operator "Mi Dushi Sail & Snorkel with lunch tour" in Catalina Bay, Aruba.

49.     At all times material hereto, Carnival had a shore excursion desk aboard the *Carnival Conquest* for the purpose of, *inter alia*, providing Carnival passengers recommendations regarding shore excursions and charging CARNIVAL passengers for shore excursions.

50.     At all times material hereto, CARNIVAL sold tickets for the "Mi Dushi Sail & Snorkel with lunch tour" in Catalina Bay, Aruba excursion to passengers aboard the *Carnival Conquest* and the Plaintiff during the subject cruise.

51.     At all times material hereto, CARNIVAL did not provide any information to Plaintiff with respect to the name, address, owner and/or operator of the excursion.

52.     While on the ship, CARNIVAL recommended to the Plaintiff to purchase the "Mi Dushi Sail & Snorkel with lunch tour" taking place in the scheduled port of call of Catalina Bay, Aruba.

53.     On or about August 20, 2015, as part of Plaintiff's cruise aboard the *Carnival Conquest*, Plaintiff participated in the "Mi Dushi Sail & Snorkel with lunch tour" excursion. This excursion was arranged for, sponsored, recommended, operated, marketed, and/or sold by CARNIVAL as part of the voyage on the subject cruise.

54.     At all times material hereto, the Tour Operators were the agent(s) and/or apparent agent(s) of CARNIVAL by virtue of the following, such that CARNIVAL is estopped from denying that CARNIVAL was the agent for the Tour Operator:

        a.      CARNIVAL made all arrangements for the subject excursion without disclosing to Plaintiff that the subject excursion was being run by another entity (and/or entities); and/or

        b.      CARNIVAL marketed the subject excursion using its company logo on its website and/or in its brochures and/or on its ship without disclosing to Plaintiff that the subject excursion was being run by another entity (and/or entities); and/or

        c.      CARNIVAL maintained an excursion desk on its ship whereby it offered, sold, provided information to, and answered questions of passengers about the subject excursion without disclosing to Plaintiff that the subject excursion was being run by another entity (and/or entities); and/or

        d.      CARNIVAL recommended its passengers to not engage in excursions, tours and/or activities that are not sold through CARNIVAL; and/or

        e.      Until the point that Plaintiff actually participated in the subject excursion, the Plaintiff's exclusive contact concerning the subject excursion was with CARNIVAL and/or CARNIVAL's onboard excursion desk; and/or

f.      The fee for the subject excursion was charged to the Plaintiff, and collected from the Plaintiff, exclusively by CARNIVAL; and/or

g.      Plaintiff received a receipt exclusively from CARNIVAL for the purchase of the subject excursion.

55.     At all times material hereto, Plaintiff relied on the above, to his detriment, so as to believe that the Tour Operators were the employee(s) and/or agent(s) of CARNIVAL, in choosing the subject shore excursion.  At no time did CARNIVAL represent to Plaintiff in particular, or the ship's passengers in general, in a meaningful way that the Tour Operators were not agent(s) and/or employee(s) of CARNIVAL.

56.     At all times material hereto, CARNIVAL was the owner or co-owner of the subject excursion.  At all times material hereto, CARNIVAL was responsible for, and liable for, the actions of the Tour Operator with respect to the subject excursion.

57.     In the alternative, at all times material hereto, a partnership and/or joint venture existed between the Tour Operator and CARNIVAL by virtue of the following, whereby CARNIVAL and the Tour Operator are jointly and severally responsible for the negligence of each other as partners of the partnership and/or joint venture:

a.      CARNIVAL and the Tour Operator entered into an agreement whereby: CARNIVAL made all arrangements for the Plaintiff, on behalf of the partnership with the Tour Operator, for the subject excursion being run by the Tour Operator; and/or

b.      CARNIVAL marketed on CARNIVAL's website and/or in its brochures and/or on its ship, on behalf of the partnership with the Tour Operator, the subject excursion being run by the Tour Operator; and/or

c.      CARNIVAL maintained an excursion desk on its ship whereby it offered, sold, provided information to, and answered questions of passengers, on behalf of the partnership with the Tour Operator, about the subject excursion being run by the Tour Operator; and/or

d.      The Tour Operator provided the subject excursion boat to be used in the subject excursion; and/or

e.      CARNIVAL determined the amount of money charged for the subject excursion being run by the Tour Operator; and/or

f.      CARNIVAL collected the amount of money charged for the subject excursion being run by the Tour Operator; and/or

g.      CARNIVAL paid the Tour Operator a portion of the sales of tickets for the subject excursion after the subject excursion tickets were sold; and/or

h.      CARNIVAL shared profits and losses with the Tour Operator for the subject excursion.

58.     At all times material hereto, CARNIVAL was an agent for the Tour Operator in the United States.

59.     At all times material hereto, CARNIVAL was a partner in the subject excursion.

60.     At all times material hereto, CARNIVAL operated and/or supervised the subject excursion.

61.     At all times material hereto, the Tour Operator owned and operated the subject excursion.  The Tour Operators were involved in providing the subject excursion to Plaintiff.  At all times material hereto, the Tour Operators were the agent(s), apparent agent(s), joint venturer(s), servant(s), and/or employee(s) of CARNIVAL and at all times

acted within the course and scope of their employment, agency, apparent agency, joint venture or service.

62     When recommending and selling the excursion, CARNIVAL never disclosed to her the magnitude of physical challenge required and the dangers he would encounter on the excursion.

63.     Instead, at all times material hereto, CARNIVAL represented the subject shore excursion as being a 'moderate' shore excursion.

64.     At all times material hereto, CARNIVAL did not provide any restrictions or warnings to its passengers regarding health or safety concerns for passengers considering the subject shore excursion.

65.     At all times material hereto, the Plaintiff relied on CARNIVAL's representations that the level of activity of the subject shore excursion was 'moderate' and that there were no notable restrictions or warnings regarding health or safety concerns for passengers purchasing and participating in the subject shore excursion.

66.      In fact, despite CARNIVAL's representations of safety to the Plaintiff, at all times material, CARNIVAL was on notice of the hazardous conditions on the excursion.

66.     The "Mi Dushi Sail & Snorkel with lunch tour" excursion consists of a 5.5 hour day excursion on board the 'Mi Dushi' watercraft. Florida cruise passengers, such as the Plaintiff, stop at three different places for snorkeling.

67.     As part of the excursion, on August 20, 2015 the Plaintiff boarded the 'Mi Dushi' watercraft in Aruba, as part of her cruise on board the *Carnival Conquest* (with itineraries that began and ended in Florida). After the first snorkeling stop, the Plaintiff was returning to her seat on the upper deck. The steps to the upper deck were unreasonably

steep for the Plaintiff's height. The Plaintiff attempted to use the upper rail to pull herself up to the top step, when her hand slipped, threw her off balance to her left and over the ledge. As a result, the Plaintiff fell down to the bottom deck.

68.     Notably, neither Carnival nor Tour Operator provided adequate warnings about the hazards involved in climbing the steep steps to the upper deck. Additionally, neither Carnival nor the Tour Operator provided alternative safe mechanisms to allow passengers to safely embark on board the watercraft 'Mi Dushi.'

69.     Upon information and belief, Carnival and the Tour Operator are on notice of prior incidents on board the watercraft 'Mi Dushi' on which passengers have injured themselves, and in particularly climbing up to the upper decks of the watercraft.

70.     As a result of the fall, the Plaintiff suffered severe injuries, including a broken ankle, fractured fibula and broken wrist.

71.     At all material times, the hazardous condition was hidden and concealed, thereby affording the Plaintiff no warning of the existence of the hazard.

**COUNT I – NEGLIGENCE AGAINST ALL DEFENDANTS**

Plaintiff re-alleges, adopts, and incorporates by reference the allegations in paragraphs one (1) thirty-nine (71) as though alleged originally herein.

72.     It was the duty of Defendants to provide Plaintiff with reasonable care under the circumstances.

73.     On or about August 20, 2015, Defendants and/or their agents, servants, joint venturers and/or employees breached their duty to provide Plaintiff with reasonable care under the circumstances.

74.     Plaintiff was injured due to the fault and/or negligence of Defendants and/or their agents, servants, joint venturers and/or employees for acts and/or omissions that include, but are not limited to, the following:

a.      Failure to provide a safe excursion; and/or

b.      Failure to properly supervise and oversee the excursion marketed, advertised, offered and sold to its guests; and/or

c.      Failure to adequately monitor excursion providers so as to ensure that the excursion tours were reasonably safe for cruise passengers and the Plaintiff; and/or

d.      Failure to adequately warn Plaintiff of the dangers of participating in the subject excursion; and/or

e.      Failure to adequately determine physical limitations which should be associated with the subject excursion; and/or

f.      Failure to adequately communicate physical limitations which are and/or should be associated with the subject excursion; and/or

g.      Failure to adequately monitor excursion providers so as to ensure that the operations of excursion tours were reasonably safe for Plaintiff and cruise passengers; and/or

h.      Failure to ensure that properly trained and supervised persons operated the subject excursion; and/or

i.      Having a shore excursion that was not competently operated; and/or

j.      Failure to provide an excursion with properly trained operators and personnel; and/or

k.      Failure to cancel the subject excursion in light of the hazardous conditions; and/or

l.      Failure to promulgate and/or enforce adequate policies and procedures with regard to the cancellation of shore excursions in hazardous conditions; and/or

m.      Failure to require the shore excursion operator to promulgate and/or enforce adequate policies and procedures with regard to the cancellation of shore excursions in hazardous conditions; and/or

n.      Failure to provide prompt, proper, or adequate first aid to the Plaintiff; and/or

o.      Failure to assist the Plaintiff to obtain adequate medical care on a timely basis; and/or

p.      Failure to require the shore excursion operator to actively monitor passengers and Plaintiff during the subject excursion; and/or

q.      Failure to adequately ascertain the shore excursion operator's ability and/or commitment to actively monitor passengers during the subject shore excursion; and/or

r.      Failure to warn Plaintiff of the shore excursion operator's inability and/or unwillingness to actively monitor passengers during the subject shore excursion; and/or

s.      Failure to warn Plaintiff of the dangers associated with the shore excursion not actively monitoring passengers during the subject shore excursion; and/or

t.      Failure to ascertain the dangers, restrictions and/or warnings regarding health or safety concerns for passengers purchasing and participating in the subject shore excursion; and/or

u.      Failure to warn Plaintiff of the dangers, restrictions and/or warnings regarding health or safety concerns for passengers purchasing and participating in the subject shore excursion; and/or

v.      Failure to adequately ascertain the level of activity and/or danger the subject shore excursion posed to passengers; and/or

w.      Failure to fairly and/or adequately communicate the level of activity and/or danger the subject shore excursion posed to passengers; and/or

x.      Inappropriately assigning the subject shore excursion a 'moderate' label, identifying it to the Plaintiff and other passengers as an easy, inactive shore excursion which posed little or no hazard or danger to passengers; and/or

y.      Failure to provide adequate shore excursion guides to adequately protect Plaintiff and other passengers from dangers in the area of the subject excursion; and/or

z.      Failure to fairly and/or adequately communicate the level of activity and/or danger the subject shore excursion posed to passengers; and/or

aa.      Operating a vessel with unreasonably steep staircases that can create a hazard for passengers; and/or

bb.      Failing to provide passengers, such as the Plaintiff, safer alternative routes to access the top decks of the vessel; and/or

cc.      Operating a vessel with inadequate and hazardous railings; and/or

dd.      Failure to warn Plaintiff of the hazards, including failing to warn the Plaintiff of unreasonable steep staircases, and inadequate and hazardous railings; and/or

ee.      Operating a vessel with stairs that have no railings; and/or

gg.      Failing to maintain the area in a clean and dry condition; and/or

hh.      Allowing water and or other slippery substance on the railing area and/or steps area; and/or

ii.     Failed to have a non-slip or non-skid surface on the steps area and/or railing area; and/or

jj.     Failed to warn Plaintiff of the danger of a wet and slippery steps and/or railing area; and/or

kk.     Failed to place rubber mats or other non-slip coverings in and around the area; and/or

ll.     Failed to provide a non-skid surface in and around the area; and/or

mm.     Failed to put up warning signs warning plaintiff of the dangerous condition in and around the area; and/or

nn.     Failed to have a procedure in place in order to ensure the steps were free from any dangerous condition; and/or

oo.     Failed to have adequate procedures to assign seating to passengers based on their physical abilities and height and weight; and/or

pp.     Failed to have an adequate barrier on the ocean side of the stairs on which the Plaintiff fell.

All of which caused the Plaintiff to suffer severe injuries while participating in the subject shore excursion.

75.     At all times material hereto, CARNIVAL had exclusive custody and control of the vessel, the *Carnival Conquest*.

76.     At all times material hereto, Defendants represented the subject shore excursion as being a 'moderate' shore excursion.

77.     At all times material hereto, Defendants did not provide any restrictions or warnings to its passengers regarding health or safety concerns for passengers considering the subject shore excursion.

78.     At all times material hereto, the Plaintiff entirely relied on Defendant's representations that the level of activity of the subject shore excursion was the easiest, least active level of all of its shore excursions and that there were no notable restrictions or warnings regarding health or safety concerns for passengers purchasing and participating in the subject shore excursion.

79.     Defendants never disclosed to her the magnitude of physical challenge required and the dangers he would encounter on the excursion.

80.     Defendants knew of the foregoing conditions causing Plaintiff's accident and did not correct them, or the conditions existed for a sufficient length of time so that Defendants, in the exercise of reasonable care under the circumstances, should have learned of them and corrected them.

81.     As a result of the negligence of Defendants, the Plaintiff was injured about Plaintiff's body and extremities, suffered physical pain, mental anguish, loss of enjoyment of life, disability, disfigurement, post-traumatic stress disorder and other mental and/or nervous disorders, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of Plaintiff's injuries, suffered physical handicap, lost earnings and lost earning capacity both past and future. The injuries are permanent or continuing in nature and Plaintiff will suffer the losses and impairments in the future. In addition, Plaintiff lost the benefit of Plaintiff's vacation, cruise, and transportation costs.

**WHEREFORE**, Plaintiff demands judgment for all damages recoverable under the law and demands trial by jury.

### COUNT II– APPARENT AGENCY OR AGENCY
### BY ESTOPPEL CLAIM AGAINST CARNIVAL

Plaintiff re-alleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through thirty-nine (71) as through alleged originally herein.

81.     At all times material hereto, the Tour Operators were the apparent agent(s) of CARNIVAL.

82.     At all times material hereto, CARNIVAL is estopped to deny that the Tour Operators were their agent(s) or employee(s).

83.     At all times material hereto, CARNIVAL made manifestations which caused Plaintiff to believe that the Tour Operator had authority to act for the benefit of CARNIVAL. These manifestations included:

a.     CARNIVAL allowed its name to be utilized in connection with the advertising of the Tour Operator; and/or

b.     CARNIVAL made all arrangements for the subject excursion without effectively disclosing to Plaintiff that the subject excursion was being run by another entity (and/or entities); and/or

c.     CARNIVAL marketed the subject excursion using its company logo on its website and/or in its brochures and/or on its ship without effectively disclosing to Plaintiff that the subject excursion was being run by another entity (and/or entities); and/or

d.     CARNIVAL maintained an excursion desk on its ship whereby it offered, sold, provided information to, and answered questions of passengers about the subject

excursion without effectively disclosing to Plaintiff that the subject excursion was being run by another entity (and/or entities); and/or

e.        Until the point that Plaintiff actually participated in the subject excursion, the Plaintiff's exclusive contact concerning the subject excursion was with CARNIVAL; and/or

f.        CARNIVAL recommended to Plaintiff to not engage in excursions, tours or activities that are not sold through CARNIVAL as CARNIVAL has no familiarity with other tours or their operations; and/or

g.        Plaintiff received a receipt exclusively from CARNIVAL for the purchase of the subject excursion; and/or

h.        The fee for the excursion was charged to the Plaintiff, and collected from the Plaintiff, exclusively by CARNIVAL.

84.      At all times material hereto, Plaintiff relied on the above, to his detriment, so as to believe that the Tour Operator were the employee(s) and/or agent(s) of CARNIVAL, in choosing the subject excursion. Additionally, CARNIVAL's actions caused Plaintiff to believe that the Tour Operator had authority to act on CARNIVAL's behalf.

85.      The foregoing acts of negligence of CARNIVAL and/or the Tour Operators were a direct and proximate cause of the Plaintiff's injuries and damages.

86.      As a result of the negligence of the Defendants, the Plaintiff was injured about Plaintiff's body and extremities, suffered physical pain, mental anguish, loss of enjoyment of life, disability, disfigurement, post-traumatic stress disorder and other mental and/or nervous disorders, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of Plaintiff's injuries,

suffered physical handicap, lost earnings and lost earning capacity both past and future. The injuries are permanent or continuing in nature and Plaintiff will suffer the losses and impairments in the future. In addition, Plaintiff lost the benefit of Plaintiff's vacation, cruise, and transportation costs.

**WHEREFORE**, Plaintiff demands judgment for all damages recoverable under the law and demands trial by jury.

## COUNT III – JOINT VENTURE BETWEEN THE TOUR OPERATOR AND CARNIVAL

Plaintiff re-alleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through thirty (71) as through alleged originally herein.

87.     At all times material hereto, CARNIVAL and the Tour Operator engaged in a joint venture to provide excursions to passengers aboard CARNIVAL's ship(s).

88.     At all times material hereto, CARNIVAL and the Tour Operators entered into an agreement where CARNIVAL would sell the subject shore excursion to its passengers and the Tour Operators would operate the subject shore excursion.

89.     As its part of the joint venture, CARNIVAL arranged for, sponsored, recommended, marketed, operated, marketed, sold and/or collected money for the subject excursion and the money was then shared between CARNIVAL and the Tour Operators.

90.     As its part of the joint venture, the Tour Operator provided labor and/or operated the subject excursion.

91.     CARNIVAL, on behalf of the joint venture, charged a fee to passengers who utilized the excursions.  The fee was split between CARNIVAL and the Tour Operator.

92.     At all times material hereto, CARNIVAL and the Tour Operator had joint and/or shared control over aspects of the joint venture.  The Tour Operator had control over the

day-to-day workings of the excursions. CARNIVAL also had control over the day-to-day workings of the excursions in that they required the Tour Operator to exercise reasonable care in the operation of the subject excursion. CARNIVAL had control over the arrangements, marketing and sales of the excursion.

93.     At all times material hereto, CARNIVAL and the Tour Operator shared a common purpose: to operate the subject shore excursion for a profit.

94.     At all times material hereto, CARNIVAL and the Tour Operator had a joint proprietary and/or ownership interest in the subject shore excursion. CARNIVAL had an interest in arranging, sponsoring, recommending, advertising, operating, and selling the subject shore excursion as well as collecting money for such excursion, and the Tour Operator had a proprietary interest in the time and labor expended in operating the subject shore excursion.

95.     At all times material hereto, CARNIVAL and the Tour Operator shared any losses sustained from the joint venture.

96.     CARNIVAL and the Tour Operator are jointly and severally responsible for the negligence of each others as partners of the partnership and/or joint venture.

97.     At all times material hereto, CARNIVAL and the Tour Operator therefore:

a.     Had an intention to create a joint venture;

b.     Had a joint proprietary interest in the subject matter of the venture;

c.     Had mutual control and/or joint control over the subject matter of the venture with respect to the provision of excursions to passengers aboard the ship;

d.     Had a right to share in the profits of the joint venture; and

e.     Would share losses which may have been sustained.

98.     As joint venturers, CARNIVAL and the Tour Operator are liable for each other's negligence.  As a result, CARNIVAL is liable for the negligent conduct of the Tour Operator.

99.     As a result of the negligence of Defendants, the Plaintiff was injured about Plaintiff's body and extremities, suffered physical pain, mental anguish, loss of enjoyment of life, disability, disfigurement, post-traumatic stress disorder and other mental and/or nervous disorders, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of Plaintiff's injuries, suffered physical handicap, lost earnings and lost earning capacity both past and future. The injuries are permanent or continuing in nature and Plaintiff will suffer the losses and impairments in the future. In addition, Plaintiff lost the benefit of Plaintiff's vacation, cruise, and transportation costs.

    **WHEREFORE**, Plaintiff demands judgment for all damages recoverable under the law and demands trial by jury.

## COUNT IV – THIRD PARTY BENEFICIARY

    Plaintiff re-alleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through thirty (71) as through alleged originally herein.

100.    At all times material hereto, CARNIVAL advertised to the Plaintiff and other passengers that one of the reasons that the Plaintiff and other passengers should book shore excursions through CARNIVAL is because CARNIVAL contracts with "insured tour operators, offering peace of mind."

101.    CARNIVAL and the Tour Operator entered into a contract to provide excursions for passengers on board CARNIVAL's ship(s).

102.    The contract between the parties clearly manifested the intent of the contracting parties that the contract primarily and directly benefits the Plaintiff third party by requiring the Tour Operator to maintain insurance and/or exercise reasonable care in the operation of the subject excursion.

103.    This contract was breached by the Tour Operator and Defendant CARNIVAL for acts and/or omissions that include, but are not limited to, the following:

a.      Failure to provide a safe excursion; and/or

b.      Failure to properly supervise and oversee the excursion marketed, advertised, offered and sold to its guests; and/or

c.      Failure to adequately monitor excursion providers so as to ensure that the excursion tours were reasonably safe for cruise passengers and the Plaintiff; and/or

d.      Failure to adequately warn Plaintiff of the dangers of participating in the subject excursion; and/or

e.      Failure to adequately determine physical limitations which should be associated with the subject excursion; and/or

f.      Failure to adequately communicate physical limitations which are and/or should be associated with the subject excursion; and/or

g.      Failure to adequately monitor excursion providers so as to ensure that the operations of excursion tours were reasonably safe for Plaintiff and cruise passengers; and/or

h.      Failure to ensure that properly trained and supervised persons operated the subject excursion; and/or

i.      Having a shore excursion that was not competently operated; and/or

j.      Failure to provide an excursion with properly trained operators and personnel; and/or

k.      Failure to cancel the subject excursion in light of the hazardous conditions; and/or

l.      Failure to promulgate and/or enforce adequate policies and procedures with regard to the cancellation of shore excursions in hazardous conditions; and/or

m.      Failure to require the shore excursion operator to promulgate and/or enforce adequate policies and procedures with regard to the cancellation of shore excursions in hazardous conditions; and/or

n.      Failure to provide prompt, proper, or adequate first aid to the Plaintiff; and/or

o.      Failure to assist the Plaintiff to obtain adequate medical care on a timely basis; and/or

p.      Failure to require the shore excursion operator to actively monitor passengers and Plaintiff during the subject excursion; and/or

q.      Failure to adequately ascertain the shore excursion operator's ability and/or commitment to actively monitor passengers during the subject shore excursion; and/or

r.      Failure to warn Plaintiff of the shore excursion operator's inability and/or unwillingness to actively monitor passengers during the subject shore excursion; and/or

s.      Failure to warn Plaintiff of the dangers associated with the shore excursion not actively monitoring passengers during the subject shore excursion; and/or

t.      Failure to ascertain the dangers, restrictions and/or warnings regarding health or safety concerns for passengers purchasing and participating in the subject shore excursion;

u.      Failure to warn Plaintiff of the dangers, restrictions and/or warnings regarding health or safety concerns for passengers purchasing and participating in the subject shore excursion; and/or

v.      Failure to adequately ascertain the level of activity and/or danger the subject shore excursion posed to passengers; and/or

w.      Failure to fairly and/or adequately communicate the level of activity and/or danger the subject shore excursion posed to passengers;

x.      Inappropriately assigned the subject shore excursion a 'moderate' label, identifying it to the Plaintiff and other passengers as an easy, inactive shore excursion which posed little or no hazard or danger to passengers; and/or

y.      Failure to provide adequate shore excursion guides to adequately protect Plaintiff and other passengers from dangers in the area of the subject excursion.

z.      Failure to fairly and/or adequately communicate the level of activity and/or danger the subject shore excursion posed to passengers;

aa.     Inappropriately assigned the subject shore excursion a 'moderate' label, identifying it to the Plaintiff and other passengers as an easy, inactive shore excursion which posed little or no hazard or danger to passengers; and/or

bb.     Failure to provide Plaintiff and other excursion passengers a safe method to disembark the vessel; and/or

cc.     Operating a vessel with unreasonably steep staircases that can create a hazard for passengers; and/or

dd.     Failing to provide passengers, such as the Plaintiff, safer alternative routes to access the top decks of the vessel; and/or

ee.     Operating a vessel with inadequate and hazardous railings; and/or

ff.     Failure to warn Plaintiff of the hazards, including failing to warn the Plaintiff of unreasonable steep staircases, and inadequate and hazardous railings; and/or

gg.     Failing to maintain the area in a clean and dry condition; and/or

hh.     Allowing water and or other slippery substance on the railing area and/or steps area; and/or

ii.     Failed to have a non-slip or non-skid surface on the steps area and/or railing area; and/or

jj.     Failed to warn Plaintiff of the danger of a wet and slippery steps and/or railing area; and/or

kk.     Failed to place rubber mats or other non-slip coverings in and around the area; and/or

ll.     Failed to provide a non-skid surface in and around the area; and/or

mm.    Failed to put up warning signs or cones warning plaintiff of the dangerous condition in and around the area; and/or

nn.     Failed to have a procedure in place in order to ensure the steps were free from any dangerous condition; and/or

oo.     Failed to have adequate procedures to assign seating to passengers based on their physical abilities and height and weight; and/or

pp.     Failed to have an adequate barrier on the ocean side of the stairs on which the Plaintiff fell.

All of which caused the Plaintiff to suffer severe injuries while participating in the subject shore excursion.

104.    As a result of the negligence of the Defendants, the Plaintiff was injured about Plaintiff's body and extremities, suffered physical pain, mental anguish, loss of enjoyment of life, disability, disfigurement, post-traumatic stress disorder and other mental and/or nervous disorders, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of Plaintiff's injuries, suffered physical handicap, lost earnings and lost earning capacity both past and future. The injuries are permanent or continuing in nature and Plaintiff will suffer the losses and impairments in the future. In addition, Plaintiff lost the benefit of Plaintiff's vacation, cruise, and transportation costs.

**WHEREFORE**, Plaintiff demands judgment for all damages recoverable under the law and demands trial by jury.

Dated: April 12, 2016.

**RESPECTFULLY SUBMITTED,**

LIPCON, MARGULIES, ALSINA &
WINKLEMAN P.A.
Attorneys for Plaintiff
Suite 1776, One Biscayne Tower
Miami, Florida 33131
Telephone: (305) 373-3016
Facsimile:  (305) 373-6204
Email: cllinas@lipcon.com


 By   /s/ *Carlos Felipe Llinás Negret*
CARLOS F. LLINAS NEGRET
FLORIDA BAR 73545